PRESTIGE BANK, A Federal
Savings Bank,

v.

INVESTMENT PROPERTIES
GROUP, INC.,

Prestige Bank, A Federal
Savings Bank,

v.

Thomas A. Iarrapino, III,

Appeal of: The Iarrapino Family
Children's Trusts, Appellant

Superior Court of Pennsylvania.

Argued March 12, 2003.
Filed May 23, 2003.

Pamela Royesky, Pittsburgh, for appellants.

Beverly W. Manne, Pittsburgh, for Prestige Bank, appellee.

Before: TODD, BENDER, and KELLY, JJ.

TODD, J.:

¶ 1 The Iarrapino Family Children's Trusts (the "Trust")[1] appeals the judgment entered on February 4, 2002 following a bench trial before the Honorable Max Baer and the denial of the Trust's post-trial motions.[2] For the reasons that follow, we affirm.

1. Although the Trust is titled in the plural, the instrument refers to the Trust in the singular. We shall do the same, as did the trial court.

2. We note that the Trust initially purported to appeal the December 7, 2001 Order denying its post-trial motions prior to entry of judgment upon the verdict. Such an appeal would be interlocutory absent final judgment and this Court would be without jurisdiction to hear it. *See Johnston the Florist, Inc. v.*

*TEDCO Constr. Corp.*, 441 Pa.Super. 281, 287, 657 A.2d 511, 514 (1995). Subsequently, however, the Trust filed a praecipe to enter judgment on the verdict, which was accomplished on February 4, 2002. Since entry of final judgment during the pendency of an appeal is sufficient to perfect our jurisdiction, *see id.* at 286, 657 A.2d at 513, we will address the appeal on its merits and have corrected the caption accordingly.

¶ 2 This is essentially a dispute regarding the ownership of the household effects of Thomas Iarrapino, III ("Iarrapino"). In 1996, Iarrapino was diagnosed with a brain tumor and advised to undergo surgery. At the time, Iarrapino was in the midst of a contentious divorce. In July 1996, approximately two weeks prior to his scheduled brain surgery, Iarrapino created the Trust [3] to benefit his three adult children: Matthew, Elizabeth and Thomas. Although he already had a will leaving all of his property to his children, Iarrapino testified that he created the Trust in contemplation of his upcoming surgery because he was "concerned for my children and wanted to protect the property that I owned and ensure that it would go into their hands." (N.T. Trial, 11/21/01, at 9.)

¶ 3 Iarrapino survived the surgery and subsequently obtained a divorce. The divorce decree, however, did not mention the Trust and provided that Iarrapino would retain all personal property.

¶ 4 As set forth in the instrument, the Trust applies to personal property then owned by Iarrapino, as well as any personalty subsequently acquired by him. As noted by the trial court in its opinion, the trust inventory included:

> On page 1 under the designation "library," the Trust lists as its property three leather, one silver and two wood photo frames and a set of five cardboard music boxes. On page 2, it lists under "kitchen," one coffee pot, six roasting racks, a mini food processor, a mixer, four whiskey glasses, one set of coasters, one gallon of olive oil and all the liquor and wine then contained in the kitchen. On the same page, under "garage," Exhibit A lists hoses, sprinklers, paints and paint supplies, tools, straw baskets, garden supplies, extension cords, hardware and electrical supplies. Under "miscellaneous items," Exhibit A lists record albums, brandy snifters, pipes and a pipe rack, two plastic hanging bags, wooden hangers, wooden shoe trees, electric shavers and "all" toilet articles.

(Trial Court Opinion, 7/24/02, at 3.) At trial, Iarrapino estimated the then-current value of the Trust property to be between $25,000 and $30,000. The Trust instrument permits Iarrapino "full and unlimited use" (Trust, 7/16/96, at 3) of the subject property during his lifetime. The trial court found that:

> Iarrapino placed into the Trust virtually everything in his home from liquor to olive oil and from garden supplies to hardware. He kept for himself the power to use without restriction, consume and/or replace every item of personalty in the Trust at any time. Thus, he kept complete control of all the Trust's assets. Iarrapino's power to consume all of the corpus amounted to the power to revoke the trust. Iarrapino could have held a garage sale and sold everything on [the trust inventory] without violating the Trust. He then could have replaced these [sold] items with new ones, creating a "new" trust, again without violating the express terms of the Trust instrument.

(*Id.* at 4.) Indeed Iarrapino testified that he quite literally had consumed items listed in the Trust inventory, specifically wine and alcoholic beverages, without compensating the Trust.

¶ 5 The Trust was irrevocable and contained a spendthrift provision exempting the property from claims of creditors of Iarrapino and of the beneficiaries. Specif-

---

**3.** Appellee questioned the date of the Trust's creation based on a potential discrepancy regarding the date of its notary seal. The trial court, however, did not find it necessary to resolve this dispute.

ically, as to Iarrapino, the spendthrift provision of the Trust instrument states that as to "any and all trust property in trust that is used by the Grantor during his lifetime, being a part of the trust corpus and property, even though it is granted to the Grantor for use during his lifetime, none of the trust property shall be subject to assignment, pledge, lien, attachment or claim of any creditor." (Trust, 7/16/96, at 7.)

¶ 6 Iarrapino's sister, Linda Antonacci, was named as trustee. Antonacci testified that as trustee, she had never inventoried the Trust's property, but that she and Iarrapino did determine annually if any property had been added. Antonacci further testified that her only duties as trustee have been signing the trust instrument and conducting the annual reviews. Antonacci also testified that the Trust had no employer identification number and carried no insurance on the property, but that it instead was covered by Iarrapino's homeowner's insurance policy.

¶ 7 Turning to the events that precipitated the present litigation, in 1999, Iarrapino's company, Investment Properties Group, Inc. ("Investment") borrowed $1,000,000 from Appellee Prestige Bank and Iarrapino personally guaranteed the loan. Investment subsequently defaulted and Prestige Bank confessed judgment against both Investment and Iarrapino. When Prestige Bank sought to execute against Iarrapino's personal property, the Trust filed a goods claim contending that it owned the items against which Prestige Bank sought to execute.

¶ 8 At the conclusion of the bench trial, the trial court determined that the Trust was merely "a clumsy attempt to shield property from potential claimants." (Trial Court Opinion, 7/24/02, at 5.) The trial court's order vacated and set aside the Trust and provided that Prestige Bank "may execute upon the alleged 'trust corpus' at any time." (Trial Court Order, 11/28/01.)

¶ 9 Following the denial of its post-trial motions, the Trust filed the present timely appeal in which it asks this Court to consider:

A. Whether the trust in question is valid and enforceable, therefore exempting the trust property from attachment.

B. Whether the goods claim of the trust should have been sustained.

(Appellant's Brief at 5.) In non-jury matters, our review is limited to determining whether the factual findings of the trial court are supported by competent evidence and whether the trial court properly applied the applicable law. *Manack v. Sandlin*, 812 A.2d 676, 679 (Pa.Super.2002), appeal denied, 572 Pa. 766, 819 A.2d 548 (2003). Moreover, the trial court's findings must be accorded the same weight and effect as a jury verdict and will not be disturbed on appeal absent an error of law or an abuse of discretion. *Id.*

¶ 10 Despite conceding in its brief that Iarrapino "kept control of the trust property", the Trust argues nevertheless that, "there is still sufficient evidence to support a valid, enforceable trust." (Appellant's Brief at 11.) We disagree. The Trust further argues that the trial court erred in declaring that the Trust was a fraud on Prestige Bank when it is undisputed that the Trust was created in anticipation of Iarrapino's brain surgery, well before Iarrapino guaranteed the loan from the bank to Investment. Again, we are not persuaded.

¶ 11 We note that our Supreme Court was faced with a similar question well over a century ago in *Mackason's Appeal*, 42 Pa. 330 (1862). There, the settlor created a spendthrift trust and transferred certain real estate to the trust, retaining to him-

self all income therefrom during his lifetime and a power of appointment. The trustees sold the real estate and invested the proceeds,[4] but the settlor subsequently became indebted. Those debts remained unpaid at the time of the settlor's death and his creditors sought payment out of the trust funds. In its opinion, the Court stated:

> This ... brings us to the simple inquiry, can the owner of property so dispose of it, for his own use, benefit, and support, as to put it beyond the reach of liability for his future debts ... and thus retain the temporal ownership without its incidents? This would be a startling proposition to affirm. It would revolutionize the credit system entirely, destroy all faith in the apparent ownership of property, and repeal all our statutes and decisions against frauds. Every man about to engage in business where there was a chance of loss, would place himself under the pupilage of trustees, and everybody's estates would be passing under settlement deeds and trustees' accounts through the courts, before, in the natural course of things, the jurisdiction of the Orphans' Court would attach.
>
> Such consequences from judicial action need not be deprecated in advance, for they never can occur.... [S]uch a trust as this, under its circumstances, does not withdraw the property from the reach of creditors subsequent to its creation.

*Id.* at 337–38.

¶ 12 Similarly, in *Nolan v. Nolan*, 218 Pa. 135, 67 A. 52 (1907), our Supreme Court noted:

> We do not doubt that a settlor may, as against everybody, except creditors, make a voluntary conveyance of his property in trust for such lawful purposes as to him may seem proper, reserving to himself the income during life, and providing in the deed that he shall have the right to exercise the appointment of beneficiaries by will .... A very different question arises, however, when the rights of creditors intervene. As against existing creditors such a conveyance would be fraudulent, and, in order to make it valid as to subsequent creditors, it must appear that the settlor has divested himself of all rights of ownership in, and control over, the property thus conveyed, reserving only to himself the right to receive the income during life .... Even in such a case the income would be considered assets subject to attachment by a creditor of the settlor. It is against public policy, and not consonant with natural justice and fair dealing, as between debtor and creditor, that a settlor should be permitted to play fast and loose with his property, in such a manner as to have the use of the income during life, and the right of disposing of the principal by will at any subsequent time he chooses to exercise the power, thus giving him all of the substantial benefits arising from the ownership thereof while he has safely put his property beyond the reach of creditors.

*Id.* at 138–39, 67 A. at 53. *See also, e.g., Morton v. Morton*, 394 Pa. 402, 147 A.2d 150 (1959); *In re Pengelly's Estate*, 374 Pa. 358, 97 A.2d 844 (1953) (holding that purported *inter vivos* trust of personal property actually was testamentary in character and, thus, subject to election by estranged widow because settlor had reserved beneficial interest in and control of trust property, including ability to consume).

---

4. At the time of the original conveyance to the trust, the settlor had substantial debts, which were paid following the sale of the subject real estate. Those debts were not at issue on appeal.

¶ 13 In the present case, that the *res* of the Trust was personal property, instead of real property, does not change our analysis. *See Pengelly's Estate, supra; Rienzi v. Goodin,* 249 Pa. 546, 95 A. 259 (1915). Nor does the fact that Iarrapino did not retain the power to revoke the Trust lead us to a different conclusion, since the trial court found that Iarrapino had retained the right to consume the Trust's assets during his lifetime and our Supreme Court has held that the power to consume is equivalent to the power to revoke. *Pengelly's Estate,* 374 Pa. at 364–65, 97 A.2d at 847. Additionally, that Iarrapino named the beneficiaries instead of retaining a power of appointment does not change our analysis. *See id.; Murphey v. C.I.T. Corp.,* 347 Pa. 591, 33 A.2d 16 (1943); *C.I.T. Corp. v. Flint,* 333 Pa. 350, 5 A.2d 126 (1939). Finally, we have reviewed the cases relied upon by the Trust and find that they do not compel a contrary result.

¶ 14 We have discerned, therefore, no legal error by the trial court in vacating the Trust and permitting Prestige Bank to execute against Iarrapino's personal property. We further find that the trial court's factual findings are supported by competent evidence of record. Finding no error of law or abuse of discretion by the trial court, we affirm the judgment entered in favor of Prestige Bank.

15 Judgment AFFIRMED.